NOAH G. BLECHMAN (State Bar No. 197167)
Noah.Blechman@mcnamaralaw.com
JOHN J. SWAFFORD (State Bar No. 321174)
John.Swafford@McNamaraLaw.com
McNAMARA, AMBACHER, WHEELER,
HIRSIG & GRAY LLP
3480 Buskirk Avenue, Suite 250
Pleasant Hill, CA 94523
Telephone:     (925) 939-5330
Facsimile:     (925) 939-0203

Attorneys for Defendants
County of Mendocino; Sgt. Samuel Logan; Deputy
Jesus Lopez; and Sheriff Matt Kendall

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| A.J.B., C.L.B., and B.B, minors by and through their Guardian ad litem Adrienne Bakewell, as successors in interest to Nicholas Bakewell, decedent; and Carolynn Bakewell, mother of decedent,<br><br>Plaintiffs,<br><br>vs.<br><br>County of Mendocino; Sergeant Samuel Logan, an individual; Deputy Jesus Lopez, an individual; City of Willits; Officer Damian Angell, an individual; Officer John Gale, an individual; Officer Donovan Shively, an individual; Sheriff Matt Kendall; Chief Brian Fay; Chief Michael Parish, and DOES1-100, inclusive,<br><br>Defendants. | Case No. 3:26-cv-01016 WHO<br><br>**COUNTY DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT FOR DAMAGES** |
|---|---|

Defendants COUNTY OF MENDOCINO, SGT. SAMUEL LOGAN, DEPUTY JESUS LOPEZ, and SHERIFF MATT KENDALL ("Defendants") respond as follows to Plaintiffs' First Amended Complaint for Damages ("FAC").  Defendants demand a jury trial in this action.  Also, attached as Exhibit A to this answer is the Mendocino County District Attorney's Office's Officer-Involved Fatal Incident Report, dated June 25, 2026, related to Decedent Mr. Bakewell's death, confirming that the involved law enforcement personnel acted in a lawful manner in their contact

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

1

and arrest of Mr. Bakewell, including the use of force which was objectively reasonable from the perspective of reasonable officers in this incident .

1.    Defendants neither admit nor deny the allegations in Paragraphs 1-12 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

**JURISDICTION**

2.    Defendants neither admit nor deny the allegations in Paragraph 13 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial, though Defendants admit that jurisdiction in this Court is proper at this time, as alleged in Paragraph 13.

3.    Defendants admit that venue in this court appears proper as the alleged incident occurred in the County of Mendocino within the Northern District of California, but deny the remaining allegations and contentions in Paragraph 14.

**PARTIES**

4.    Defendants neither admit nor deny the allegations in Paragraph 15 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

5.    Defendants neither admit nor deny the allegations in Paragraph 16 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

6.    Defendants neither admit nor deny the allegations in Paragraph 17 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

7.    Defendants neither admit nor deny the allegations in Paragraph 18 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

8.    Defendants neither admit nor deny the allegations in Paragraph 19 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

9. Defendants admit COUNTY OF MENDOCINO is a municipal public entity, as alleged in Paragraph 20. Defendants further admit that SHERIFF MATT KENDALL, SAMUEL LOGAN, and JESUS LOPEZ were employed with COUNTY OF MENDOCINO on June 5, 2025, at the time of the alleged incident. Defendants neither admit nor deny the remaining allegations in Paragraph 20 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

10. Defendants neither admit nor deny the allegations in Paragraph 21 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial, though admit that Defendants SAMUEL LOGAN, and JESUS LOPEZ were employed with COUNTY OF MENDOCINO on June 5, 2025, at the time of the alleged incident.

11. Defendants neither admit nor deny the allegations in Paragraph 22 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial, though admit that Defendants SAMUEL LOGAN, and JESUS LOPEZ were employed with COUNTY OF MENDOCINO on June 5, 2025, at the time of the alleged incident.

12. Defendants neither admit nor deny the allegations in Paragraph 23 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

13. Defendants neither admit nor deny the allegations in Paragraph 24 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

14. Defendants neither admit nor deny the allegations in Paragraph 25 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

15. Defendants neither admit nor deny the allegations in Paragraph 26 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

COUNTY DEFENDANTS' ANSWER TO FAC - 3:26-cv-01016 WHO

16. Defendants neither admit nor deny the allegations in Paragraph 27 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

17. Defendants neither admit nor deny the allegations in Paragraph 28 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

18. Defendants neither admit nor deny the allegations in Paragraph 29 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

19. Defendants neither admit nor deny the allegations in Paragraph 30 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

20. Defendants neither admit nor deny the allegations in Paragraph 31 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

21. Defendants neither admit nor deny the allegations in Paragraph 32 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

22. Defendants neither admit nor deny the allegations in Paragraph 33 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

23. Defendants neither admit nor deny the allegations in Paragraph 34 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

24. Defendants neither admit nor deny the allegations in Paragraph 35 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

4

25.    Defendants neither admit nor deny the allegations in Paragraph 36 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

26.    Defendants neither admit nor deny the allegations in Paragraph 37 of Plaintiffs' FAC because it includes contentions and legal matters not proper for admission or denial.

## FACTS COMMON TO ALL CAUSES OF ACTION

27.    In answering the allegations in Paragraphs 38-50, Defendants respond as follows: *See* Exhibit A for further information and details on this incident. On June 5, 2025, at approximately 7:00 p.m., Mendocino County deputies were dispatched to the 1000 block of Hearst Willits Road in Willits, California, Mendocino County, due to a report of a male hitchhiker who may have gotten into a physical altercation with a driver and then was walking in the area.

28.    When deputies arrived in the area, a subject matching the description from the call for service, later determined to be Nicholas Bakewell ("Bakewell"), was walking in the middle of the roadway and then began to aggressively approach a deputy. Deputies tried to de-escalate the situation by speaking calmly to Bakewell, but Bakewell did not comply with commands and then aggressively approached a deputy and erratically threw himself in the bushes along the roadway. Bakewell continued to fail to respond to less lethal force options and comply with commands, and then violently committed an assault/battery towards a deputy when he was contacted to be handcuffed and violently overcame the deputy from being handcuffed (only one handcuff could be placed on his wrist). Other less lethal force options were ineffective, and further commands were disregarded by Bakewell. After additional law enforcement officers arrived, including from Willits, officers were finally able to overpower Bakewell and get him under control and in handcuffs. Even in handcuffs on the ground, Bakewell tried to kick at officers.

29.    After his arrest, law enforcement officers monitored Bakewell as he calmed down and within a short amount of time, officers noticed that Bakewell was no longer responding to officers and appeared to be experiencing a medical issue. Medical personnel were immediately called to the scene as officers started to evaluate Bakewell's condition, including providing Narcan

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

to try to reverse an overdose, but Bakewell was not responsive. Emergency efforts were provided by officers until emergency medical services arrived and continued with his care. Unfortunately, Bakewell could not be revived and died at the scene. His toxicology screening showed that he was under the influence of methamphetamine, amphetamine, GHB, and psilocybin, and other substances, at the time of this incident.

30.    Except as expressly admitted, Defendant denies the remaining allegations in Paragraphs 38 through 50 of Plaintiffs' FAC. Additionally, Defendants do not have all the information available since this matter is being investigated, as is customary, by the District Attorney's Office so counsel for Defendants do not have all investigatory reports to review for this answer and reserves the right to amend or supplement this answer.

## FIRST CAUSE OF ACTION

**Unreasonable Search and Seizure—Excessive Force (42 U.S.C. § 1983)**

**(On Behalf of Plaintiffs A.J.B., C.L.B., and B.B Against Defendants SAMUEL LOGAN, JESUS LOPEZ, DAMIAN ANGELL, JOHN GALE, DONOVAN SHIVLEY, and DOES 1-100)**

31.    In answering paragraphs 51 through 64, Defendants incorporate by reference their responses to paragraphs 1 through 50 of Plaintiffs' FAC.

32.    Except as to matters previously admitted, Defendants deny the remaining allegations in paragraphs 51 through 64 of Plaintiffs' FAC.

## SECOND CAUSE OF ACTION

**Deprivation of Life Without Due Process-(42 U.S.C. § 1983)**

**(On Behalf of all Plaintiffs Against Defendants SAMUEL LOGAN, JESUS LOPEZ, DAMIAN ANGELL, JOHN GALE, DONOVAN SHIVLEY, and DOES 1-100)**

33.    In answering paragraphs 65 through 77, Defendants incorporate by reference their responses to paragraphs 1 through 50 of Plaintiffs' FAC.

34.    Except as to matters previously admitted, Defendants deny the remaining allegations in paragraphs 65 through 77 of Plaintiffs' FAC.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

COUNTY DEFENDANTS' ANSWER TO FAC - 3:26-cv-01016 WHO

**THIRD CAUSE OF ACTION**

**Interference with Parent-Child Relationship-(42 U.S.C. § 1983)**

**(On Behalf of all Plaintiffs Against Defendants SAMUEL LOGAN, JESUS LOPEZ,**

**DAMIAN ANGELL, JOHN GALE, DONOVAN SHIVLEY, and DOES 1-100)**

35.    In answering paragraphs 51 through 61 (as numbered in Plaintiffs' FAC, pgs. 17-19, and the paragraph numbering reverts to prior used numbers)[1], Defendants incorporate by reference their responses to paragraphs 1 through 50 of Plaintiffs' FAC.

36.    Except as to matters previously admitted, Defendants deny the remaining allegations in paragraphs 51 through 61 of Plaintiffs' FAC.

**FOURTH CAUSE OF ACTION**

**Municipal Liability — Unconstitutional Custom, Practice, or Policy (42 U.S.C. §1983)**

**(Against COUNTY OF MENDOCINO, SHERIFF MATT KENDALL, JESUS LOPEZ,**

**SAMUEL LOGAN, CITY OF WILLITS, CHIEF BRIAN FAY, CHIEF MICHAEL**

**PARISH, OFFICER DAMIAN ANGELL, OFFICER JOHN· GALE, OFFICER**

**DONOVAN SHIVLEY, and DOES 1-100)**

37.    In answering paragraphs 62 through 89, Defendants incorporate by reference their responses to paragraphs 1 through 50 of Plaintiffs' FAC.

38.    Except as to matters previously admitted, Defendants deny the remaining allegations in paragraphs 62 through 89 of Plaintiffs' FAC.

**FIFTH CAUSE OF ACTION**

**Municipal Liability — Failure to Train (42 U.S.C. § 1983)**

**(Against COUNTY OF MENDOCINO, SHERIFF MATT KENDALL, JESUS LOPEZ,**

**SAMUEL LOGAN, CITY OF WILLITS, CHIEF BRIAN FAY, CHIEF MICHAEL**

**PARISH, OFFICER DAMIAN ANGELL, OFFICER JOHN GALE, OFFICER DONOVAN**

**SHIVLEY, and DOES 1-100)**

39.    In answering paragraphs 90 through 105, Defendants incorporate by reference their

---

[1] Plaintiffs' FAC has duplicative paragraph numbering between the Second and Third Causes of Action and beyond, so Defendants will refer to the paragraph numbers used by Plaintiffs even though they are erroneous.

COUNTY DEFENDANTS' ANSWER TO FAC - 3:26-cv-01016 WHO

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

responses to paragraphs 1 through 50 of Plaintiffs' FAC.

40.  Except as to matters previously admitted, Defendants deny the remaining allegations in paragraphs 90 through 105 of Plaintiffs' FAC.

## SIXTH CAUSE OF ACTION

### Municipal Liability — Ratification (42 U.S.C. § 1983)

### (Against COUNTY OF MENDOCINO, SHERIFF MATT KENDALL, CITY OF WILLITS, CHIEF BRIAN FAY, CHIEF MICHAEL PARISH, and DOES 1-100)

41.  In answering paragraphs 106 through 121, Defendants incorporate by reference their responses to paragraphs 1 through 50 of Plaintiffs' FAC.

42.  Except as to matters previously admitted, Defendants deny the remaining allegations in paragraphs 106 through 121 of Plaintiffs' FAC.

## SEVENTH CAUSE OF ACTION

### Failure to Summon Medical Care, Fourth Amendment Violation (Survival Action 42 U.S.C. § 1983)

### (Against JESUS LOPEZ, SAMUEL LOGAN, OFFICER DAMIAN ANGELL, OFFICER JOHN GALE, OFFICER DONOVAN SHIVLEY, and DOES 1-100)

43.  In answering paragraphs 122 through 128, Defendants incorporate by reference their responses to paragraphs 1 through 50 of Plaintiffs' FAC.

44.  Except as to matters previously admitted, Defendants deny the remaining allegations in paragraphs 122 through 128 of Plaintiffs' FAC.

## EIGHTH CAUSE OF ACTION

### Wrongful Death (Cal. Civ. Proc. Code § 377.60)

### (Against COUNTY OF MENDOCINO, CITY OF WILLITS, JESUS LOPEZ, SAMUEL LOGAN, OFFICER DAMIAN ANGELL, OFFICER JOHN GALE, OFFICER DONOVAN SHIVLEY, and DOES 1-100)

45.  In answering paragraphs 129 through 136, Defendants incorporate by reference their responses to paragraphs 1 through 50 of Plaintiffs' FAC.

46.  Except as to matters previously admitted, Defendants deny the remaining allegations

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

COUNTY DEFENDANTS' ANSWER TO FAC - 3:26-cv-01016 WHO

in paragraphs 129 through 136 of Plaintiffs' FAC.

## NINTH CAUSE OF ACTION

### Assault and Battery

**(On Behalf of all Plaintiffs Against COUNTY OF MENDOCINO, CITY OF WILLITS, JESUS LOPEZ, SAMUEL LOGAN, OFFICER DAMIAN ANGELL, OFFICER JOHN GALE, OFFICER DONOVAN SHIVLEY, and DOES 1-100)**

47.     In answering paragraphs 137 through 144, Defendants incorporate by reference their responses to paragraphs 1 through 50 of Plaintiffs' FAC.

48.     Except as to matters previously admitted, Defendants deny the remaining allegations in  paragraphs 137 through 144 of Plaintiffs' FAC.

## TENTH CAUSE OF ACTION

### Negligence

**(On Behalf of all Plaintiffs Against COUNTY OF MENDOCINO, CITY OF WILLITS, JESUS LOPEZ, SAMUEL LOGAN, OFFICER DAMIAN ANGELL, OFFICER JOHN GALE, OFFICER DONOVAN SHIVLEY, and DOES 1-100)**

49.     In answering paragraphs 145 through 152, Defendants incorporate by reference their responses to paragraphs 1 through 50 of Plaintiffs' FAC.

50.     Except as to matters previously admitted, Defendants deny the remaining allegations in  paragraphs 145 through 152 of Plaintiffs' FAC.

## ELEVENTH CAUSE OF ACTION

### Violation of Bane Act (Cal. Civil Code § 52.1)

**(On Behalf of all Plaintiffs Against COUNTY OF MENDOCINO, CITY OF WILLITS, JESUS LOPEZ, SAMUEL LOGAN, OFFICER DAMIAN ANGELL, OFFICER JOHN GALE, OFFICER DONOVAN SHIVLEY, and DOES 1-100)**

51.     In answering paragraphs 153 through 160, Defendants incorporate by reference their responses to paragraphs 1 through 50 of Plaintiffs' FAC.

52.     Except as to matters previously admitted, Defendants deny the remaining allegations in  paragraphs 153 through 160 of Plaintiffs' FAC.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

9

**PRAYER FOR RELIEF**

53. Defendants neither admit nor deny the allegations in the "PRAYER FOR RELIEF" portion of Plaintiffs' FAC, which includes six subparts, as they include contentions and legal matters not proper for admission or denial.

**AFFIRMATIVE DEFENSES**

1. AS AND FOR A FIRST, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Plaintiffs' FAC fails to state cognizable legal theories and/or facts sufficient to constitute cognizable legal theories against Defendants.

2. AS AND FOR A SECOND, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Plaintiffs failed to state facts sufficient to support a prayer for punitive damages and/or exemplary damages against any Defendant.

3. AS AND FOR A THIRD, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Plaintiffs and/or Decedent had full knowledge of all the risks, dangers, and hazards, if any there were, and nevertheless voluntarily and with full appreciation of the amount of danger involved in Decedent's actions and the magnitude of the risk involved, assumed the risk of injuries and damages to themselves.

4. AS AND FOR A FOURTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that at all times and places mentioned in Plaintiffs' FAC, Plaintiffs and/or Decedent failed to mitigate the amount of their damages, if any. The damages claimed by Plaintiffs and/or Decedent could have been mitigated by due diligence on their part and/or Decedent's part or by one acting under similar circumstances. Plaintiffs and/or Decedent's failure to mitigate is a bar or limit to their recovery under their FAC.

5. AS AND FOR A FIFTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the sole proximate cause of the injuries and damages, if any, allegedly suffered by Plaintiffs and/or Decedent was the negligence and fault of the Decedent and/or others, or on the part of any person or entity for whose acts or omissions Defendants are not legally or otherwise responsible, or, in the alternative, that the negligence and fault of the Decedent and/or others in and about the matters alleged in the FAC herein proximately contributed to the happening

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

10

of the incident and to the injuries, loss and damages complained of, if any there were, and said negligence on the part of Decedent or others requires that any damages awarded to Plaintiffs and/or Decedent shall be diminished in proportion to the amount of fault attached to the Plaintiffs, Decedent and/or others.

6.    AS AND FOR A SIXTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Plaintiffs and/or Decedent, by virtue of their own conduct and omissions, have enhanced and materially contributed to the damages, if any there may be, allegedly sustained by Plaintiffs and/or Decedent as a result of the acts or omissions complained of herein.

7.    AS AND FOR A SEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that at all times herein mentioned, the acts complained of, if any there were, were privileged under applicable federal and state statutes and/or case law.

8.    AS AND FOR AN EIGHTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that at all times herein mentioned, Defendants are immune from liability herein pursuant to the provisions of California Government Code Sections 810 through 996.6.

9.    AS AND FOR A NINTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that at all times herein mentioned, all actions taken by the Defendants (and/or any other officers named herein at any time) was/were reasonable under the circumstances and taken under a good faith belief that the actions were not unlawful and the Defendants are therefore immune under the "good faith immunity" and/or qualified immunity doctrine.

10.    AS AND FOR A TENTH SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Defendants shall only be responsible for damages, if any, in an amount determined pursuant to and in accordance with Proposition 51 (Civil Code § 1431.2).

11.    AS AND FOR AN ELEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the alleged acts or omissions of the Defendants (and/or any other officers named herein at any time), was/were based upon the officers' reasonable cause to believe that they had reasonable suspicion to detain and/or probable cause to arrest the Decedent and/or take Decedent into custody for a 5150 hold and the Defendants used reasonable force to effect the detention and/or arrest, to prevent the escape and overcome the resistance of the Decedent, and for

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

the safety of the lives of themselves and others; and the Defendants are therefore immune by virtue of the provisions of Section 836.5(a) and 836.5(b) of the Penal Code.

12.    AS AND FOR A TWELFTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that only such reasonable force as was necessary and lawful under the circumstances was used by the Defendants and/or other involved law enforcement officers.

13.    AS AND FOR A THIRTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that to the extent Plaintiffs alleges or asserts matters not contained in a legally sufficient claim filed by them, this action is barred by the claims requirement set forth in California Government Code § 905 et seq.

14.    AS AND FOR A FOURTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the matters complained of by Plaintiffs, if committed by the Defendants, were consented to by Decedent and/or Plaintiffs.

15.    AS AND FOR A FIFTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that at or about the time of the alleged event, the Defendants were presented with and had in their possession sufficient facts to constitute reasonable suspicion for a detention and/or probable cause for the arrest and/or custody of Decedent.

16.    AS AND FOR A SIXTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Plaintiffs have failed to state a cause of action in that each of the causes of action as alleged herein is barred by provisions of Sections 312 through 362 of the California Code of Civil Procedure.

17.    AS AND FOR A SEVENTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Plaintiffs, some or all, have no standing to bring this civil action and/or some of the claims alleged in this action.

18.    AS AND FOR AN EIGHTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that there is no statutory or other basis for the attorney's fees sought by Plaintiffs.

19.    AS AND FOR A NINETEENTH SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the Defendants were acting in good faith in respect to the acts and/or

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

12

omissions alleged in the FAC.

20.    AS AND FOR A TWENTIETH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Decedent, himself, was violent, combative, threatening, and/or resistive towards the Defendant officers and the Defendant officers, acted lawfully and/or in self-defense in relation to any claimed use of force.

21.    AS AND FOR A TWENTY-FIRST, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that they reasonably relied upon dispatch reporting and other sources of information, in taking the action against Decedent, making their conduct reasonable and lawful under the circumstances.

22.    AS AND FOR A TWENTY-SECOND, SEPARATE AND AFFIRMATIVE DEFENSE, these answering Defendants allege that they are immune from liability herein pursuant to the absolute privilege of Civil Code § 47(b).

23.    AS AND FOR A TWENTY-THIRD, SEPARATE AND AFFIRMATIVE DEFENSE, these answering Defendants allege that there are no lawful grounds for declaratory and/or injunctive relief, if any such claims are ever made in this matter.

24.    AS AND FOR A TWENTY-FOURTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Defendants and/or its employees is/are not liable for an injury resulting from an action or omission where the act or omission was the result of the exercise of vested discretion.

25.    AS AND FOR A TWENTY-FIFTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that any harm which came to Plaintiffs/Decedent, which is expressly denied, was a direct and proximate result of omissions or actions of Plaintiffs/Decedent and/or others and/or the violation of law by Plaintiffs/Decedent and/or others.

26.    AS AND FOR A TWENTY-SIXTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that because the FAC is couched in conclusory terms, Defendants cannot fully anticipate all affirmative defenses that may be applicable to this matter. Accordingly, the right to assert separate affirmative defenses, if and to the extent such affirmative defenses are applicable, is hereby reserved.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

27. AS AND FOR A TWENTY-SEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the FAC fails to state a viable claim under the doctrine announced in *Monell v. Dep't of Soc. Servs,* 436 U.S. 658 (1978).

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants pray for the following relief:

1. That Plaintiffs take nothing by way of their FAC herein;

2. For costs of suit;

3. For attorney's fees;

4. For such further relief as this Court may deem just and proper.

The undersigned attests that permission in the filing of this document(s) has been obtained from the signatory below which shall serve in lieu of the actual signatures on the document(s).

Dated: July 6, 2026

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP

By:   /s/ Noah G. Blechman
Noah G. Blechman
John J. Swafford
Attorneys for Defendants
County of Mendocino; Sgt. Samuel Logan; Deputy Jesus Lopez; and Sheriff Matt Kendall

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

COUNTY DEFENDANTS' ANSWER TO FAC - 3:26-cv-01016 WHO

# EXHIBIT A

# OFFICER-INVOLVED FATAL INCIDENT REPORT



Employer Agencies: Mendocino County Sheriff's Office; Willits Police Department

Decedent: Nicholas Bakewell

Date of Incident: June 5, 2025

Date of Report: June 25, 2026

Report Prepared by:

## MENDOCINO COUNTY DISTRICT ATTORNEY

Eloise Kelsey, Senior Deputy District Attorney

*In the Matter of the Death of Nicholas Bakewell*                    Mendocino County District Attorney

## TABLE OF CONTENTS

I.    Introduction ........................................................................................3

II.   Scope of Review..................................................................................3

III.  Standard of Review ............................................................................4

IV.   Summary of Facts................................................................................4

    A. Civilian Witnesses..........................................................................5

    B. Summary of Information Provided Through Dispatch ....................8

    C. Involved Officers............................................................................8

    D. Officer Timeline — June 5, 2025 ..................................................9

V.    Legal Standards.................................................................................22

VI.   Cause of Death, Autopsy, and Toxicology Findings.........................23

    A. Homicide Defined.........................................................................23

    B. Positional Restraint and Measures to Subdue ..............................24

    C. Cause of Death .............................................................................25

    D. Autopsy Findings .........................................................................25

    E. Toxicology....................................................................................25

VII.  Conclusion and Determination ........................................................26

# I. INTRODUCTION

On June 5, 2025, thirty-six-year-old Nicholas Bakewell died following a law enforcement encounter on Hearst-Willits Road in the Willits area of Mendocino County. Mr. Bakewell came into contact with deputies and officers from the Mendocino County Sheriff's Office (MCSO) and the Willits Police Department (WPD) after a series of reports of erratic and violent behavior in a public roadway. Following his restraint and arrest, Mr. Bakewell became unresponsive. He was pronounced deceased at 7:42 p.m.

When a death occurs during an encounter with law enforcement, the District Attorney's Office has a legal and ethical obligation to conduct an independent review to determine whether the use of force violated California law. That responsibility exists regardless of whether the force involved a firearm or other means and regardless of the identity of the individuals involved.

The purpose of this report is to explain the scope of the review, the legal standards applied, and the reasoning supporting the determination reached. This document is intended to provide transparency to the community regarding how charging decisions are made while recognizing that the District Attorney does not determine civil liability.

Officer-involved fatalities are matters of significant public concern, as they should be. It is important that the legal framework and factual analysis underlying this decision be set forth clearly and in plain language. Transparency in this process is essential to maintaining public confidence in the fair and impartial administration of justice.

# II. SCOPE OF REVIEW

The purpose of the District Attorney's investigation and review of any critical incident is to establish the presence or absence of criminal liability on the part of any involved party, including law enforcement employees.

The Mendocino County District Attorney's Office conducted an independent and comprehensive review of the events that occurred on June 5, 2025. The review included body-worn camera footage from Mendocino County Sheriff's Office (MCSO) and Willits Police Department (WPD) officers; dispatch audio and Computer-Aided Dispatch (CAD) records; interviews of involved officers; interviews of civilian witnesses who observed events before and during law enforcement contact; scene photographs and physical evidence; autopsy findings and forensic pathology opinions; toxicology testing; and relevant statutory and case law governing use of force.

All available video evidence was reviewed in its entirety and compared against witness statements and physical findings. The timing of events was cross-referenced using dispatch records and synchronized body camera footage.

The District Attorney's review was limited to determining whether the evidence supports the filing of criminal charges under California law. This review does not determine civil liability, policy compliance, or administrative discipline, which are evaluated through separate processes. This report should not be interpreted as expressing an opinion on those matters.

## III.  STANDARD OF REVIEW

The District Attorney is the chief law enforcement official of Mendocino County. The District Attorney is responsible for deciding what cases to prosecute and has the responsibility to review and approve the filing of all criminal cases in the county.

The California Rules of Professional Conduct, Rule 3.8, provides that prosecutors shall not institute criminal charges when the prosecutor knows that the charges are not supported by probable cause. Although a prosecutor can institute criminal charges when supported by probable cause, in filed criminal cases the District Attorney has the burden of proving a defendant's guilt beyond a reasonable doubt. This is the highest burden of proof found in the law. A defendant facing criminal charges is entitled to have the question of their guilt determined by a jury. That jury, consisting of twelve people from the community, must vote unanimously for guilt before a defendant can be convicted of a charged criminal offense.

When determining whether criminal charges are appropriate, the District Attorney must consider all of the evidence, including evidence that supports an affirmative defense, such as self-defense or the justifiable use of force by a peace officer. Criminal charges are warranted only when the District Attorney determines that the evidence of guilt is of such convincing force that it would support a conviction for the crime charged by a reasonable and objective jury after hearing all the admissible evidence, including evidence of any defenses.[1]

## IV.  SUMMARY OF FACTS

On the evening of June 5, 2025, a 911 call was placed reporting a man behaving erratically along Hearst-Willits Road in the area of East Valley Road, Willits.  The caller described the individual as running in and out of the roadway, yelling, and engaging in physical altercations with other individuals, including a driver of an all-terrain vehicle ATV and the driver of a silver SUV.

Witnesses reported that the man appeared disoriented and aggressive.  He was observed jumping from a moving vehicle, choking out a person attempting to get him to safety, and striking a driver in the face. Witnesses expressed concern that the individual might be struck by a vehicle or cause serious injury to others.

---

1 See Penal Code section 835a.

At approximately 7:07 p.m., a Mendocino County Sheriff's deputy arrived in the area and contacted the individual, later identified as Nicholas Bakewell. According to body-worn camera footage, Mr. Bakewell approached the deputy in an agitated manner, assumed a fighting stance, and ignored repeated commands to get on the ground. When additional deputies arrived, Mr. Bakewell ran from MCSO, jumped into thick brush and continued to ignore commands.

Officers attempted verbal de-escalation and issued repeated commands for compliance. When Mr. Bakewell advanced toward an officer in a fighting stance, less-lethal force options were deployed, including oleoresin capsicum (OC) spray and, later, a conducted energy device (Taser). Despite these efforts, Mr. Bakewell continued to resist attempts to detain him.

Additionally, Willits Police Department officers arrived to assist. Mr. Bakewell, who was actively resisting efforts to place him in handcuffs, stiffened his arms, attempted to rise from the ground, and struggled against officers' attempts to control his movements. After continued resistance, officers were able to secure him in handcuffs at approximately 7:11 p.m.

Within moments of being restrained, officers observed changes in Mr. Bakewell's responsiveness. He was repositioned, handcuffs were removed, and medical assistance was immediately requested. Officers began first aid measures, including sternum rubs and cardiopulmonary resuscitation (CPR), and administered Narcan. Emergency medical personnel arrived shortly thereafter and continued lifesaving efforts.

Mr. Bakewell was pronounced deceased at 7:42 p.m.

## A. Civilian Witnesses

Clint Harbour

Clint Harbour and Nicholas Bakewell drove to Ukiah together in the early afternoon of June 5, 2025. They made several stops in Ukiah, their last being at a pawn shop at close to 5 p.m. They then stopped at Harbour's cousin's house in Redwood Valley.

During that time, Harbour and Bakewell did two "hot rails" which are a thin line of methamphetamine ingested by smoking. Bakewell also consumed 4-5 mushrooms and later Harbour watched Bakewell consume a second handful of mushrooms. Harbour then drove with Bakewell to the Coyote Valley Casino gas station. Harbour began to notice Bakewell was experiencing the effects of the drugs he had consumed. Bakewell was gripping the dashboard and asking Harbour to slow down even though they were traveling at 25 mph.

Once they approached the intersection of Hearst-Willits Road and Reynolds Hwy, Willits, Bakewell abruptly punched Harbour in the nose, breaking it and immediately causing it to bleed. He was also hit just below the eye. Bakewell attempted to jump out of the moving vehicle but broke off the door handle. While the vehicle was still moving, Bakewell then jumped out of the passenger window, landing on the pavement, stood up, and started running westbound on Hearst-Willits Road.

Harbour went to a nearby friend's residence and told Owen Kenny and Eddie Esquivel that Bakewell was having a "bad trip" from eating mushrooms. The three returned to the area to find Bakewell. Kenny and Esquivel both took ATVs and Harbour returned in his vehicle. Kenny found Bakewell and Bakewell got on the back of his ATV. When Harbour arrived near the area of O'Leary's Feed, he watched as Bakewell began to choke Kenny to the point where Kenny began to lose consciousness and they both fell from the ATV.

Harbour saw a man pull up and yell at Bakewell. Bakewell ran around to the passenger side of the vehicle and got in. The vehicle drove off westbound. Harbour, Kenny and Esquivel then left the area and returned to the residence. He never saw Bakewell from that time and learned later of his death.

Ashley Gantt

Ms. Gantt was leaving her family ranch property on June 5th and driving southbound on Hearst-Willits Road when she saw a man on the westside of the roadway in front of her. The man was walking and jogging erratically and waving his arms, simulating a gun in both hands. She had her windows down and could hear him screaming profanities. She heard "Fuck! I want to fucking kill myself! I want to fucking kill Her!" As she went to pass him, he lunged to his left trying to get in front of her car. She had to move to the oncoming lane in order to avoid him. She drove approximately 300 yards ahead and stopped at the intersection of Hearst-Willits Road and Valley Road and called 911.

While on the phone with the 911 dispatcher, she saw a man on the back of an ATV being driven by another man. She then saw the male passenger start to assault the driver. The man placed the driver into a "chokehold" and pulled the driver off the ATV. The men then began to physically fight and there was a lot of screaming.

She then witnessed a silver SUV drive up to stop the fight. The SUV driver leaned out of his window and said something. The same male who had been originally in the road and then assaulted the ATV driver then got into the SUV passenger seat. She witnessed the SUV begin to drive away. After moving about 20-30 yards, she saw the male passenger punch the SUV driver in the head area with his right fist. She saw the passenger punch the driver two more times and the driver's nose was bleeding profusely. The driver placed his hands up to protect himself and the SUV stopped. The male passenger got out of the vehicle and went jogging down the road yelling and screaming and waving his hands in the air. She then left the area and took the freeway to Willits to avoid the man. She spoke with CHP dispatch a second time to confirm the description of the ATV and direction of travel.

*In the Matter of the Death of Nicholas Bakewell*                    Mendocino County District Attorney

### Owen Kenny

Mr. Kenny said he was not with Bakewell on June 5th during the day. He went to pick Bakewell up when Clint Harbour came to tell him that Bakewell was on mushrooms and needed help before he got in trouble with law enforcement. He left his residence and took his ATV to find Bakewell.

When he found Bakewell, Mr. Kenny noticed Bakewell "wasn't himself" and appeared "scared." Bakewell got on the back of Mr. Kenny's ATV and got "violent." Bakewell began to forcefully choke him out. Bakewell called him a "piece of shit" and made other nonsensical comments. He stopped the ATV and Bakewell got off and then into Mr. Glass's truck which had just arrived.

Mr. Kenny left the area and upon returning, Bakewell had already made contact with law enforcement.

### Michael Glass

Mr. Glass was contacted in the Adventist Health Howard Memorial Emergency Room at 2123 hours on June 5, 2025, where he was awaiting treatment for injuries from Bakewell. Mr. Glass said he had been driving westbound in the area of Valley Road when he saw "Nick" arguing with somebody on an ATV. He had known Nick for about 9-10 years but did not know Nick's last name.

Mr. Glass said he could see Bakewell was "hot" and "mad" so he drove over and spoke with him. He told Bakewell to get into his vehicle which Bakewell did. He only drove about 100 feet when he heard Bakewell say "This ain't okay, this don't feel okay." He was about to ask him what was wrong when Bakewell screamed at the "top of his lungs" and "blindsided" Mr. Glass by punching him in the face.

Mr. Glass stopped his vehicle and turned it off. He said, "Nick, what the hell did you hit me for?" Bakewell was irate and not making any sense. Mr. Glass told him to get out of the vehicle. He watched as Bakewell walked away on foot still "screaming and yelling." He recalls two men coming up on two ATVs and one saying something to the effect that Bakewell had "eaten a couple handfuls of mushrooms." Mr. Glass then drove to the hospital to get his injuries treated. He clarified that after seeing Bakewell walk away, he never saw him again and was not present when law enforcement encountered Bakewell.

### Tammy Gallups

On June 5th, Ms. Gallups stopped at the gate to her property on Hearst-Willits Road. She heard screaming and saw a man running down the road. She did not recognize the man at first. As the man approached, she recognized him as Nicholas Bakewell, who had been childhood friends with her son. She tried to ask what Bakewell was doing, but he did not hear her and kept running. She saw him running in the middle of the road toward an oncoming vehicle.

She left her property and went to the area of Bray Road and Hearst-Willits Road where she saw Bakewell face down on the road with one MCSO deputy attempting to handcuff him. She saw another MCSO deputy had his Taser drawn, but she was not sure if the Taser had been deployed. She recalled feeling glad Bakewell was getting arrested because she did not want to see Bakewell get hit by a car. She left the area just as WPD officers were responding.

Katherine Emerson

Ms. Emerson's residence is in the immediate vicinity of the encounter between Bakewell and law enforcement. On the evening of June 5th, she first heard loud voices — "Angry voices, really loud angry voices." She stood on her porch facing Hearst-Willits Road. She observed two men walking along the road yelling at each other. One man was wearing dark clothing and the other light clothing. She said one was "sorta chasing the other." Her view was fleeting. She could not recall which man was chasing the other.

Mary Colvig

Ms. Colvig was driving into Willits at approximately 1900 hours and had turned east on Commercial Street. She encountered some graduation-related traffic. She stopped behind three cars and had a clear view of police officers attempting to get a man to "settle down" and handcuff him. She said she could see the man was fighting back. She could see the man was resisting arrest — face down, with officers trying to hold him down as he kept trying to stand up and fight back. She believed she saw an officer tase the man while 5-6 officers were trying to control him. She noticed the man stopped resisting and the officers were able to handcuff him. She then saw an officer, "within 1-2 minutes," turn the suspect over onto his back and begin chest compressions. She did not want her daughter to witness anymore and left the area.

**B. Summary of Information Provided Through Dispatch**

When a person calls 911, they speak with a dispatcher who transmits information to law enforcement personnel in the field. Any transmitted information is memorialized in a Computer-Aided Dispatch (CAD) log. After calls were placed regarding Mr. Bakewell on June 5, 2025, a CAD log was generated that memorialized the information transmitted to deputies and officers.

At 1903:29, MCSO deputies were dispatched at the request of CHP for an agency assist. Information from the 911 caller described a white male adult jumping in and out of the roadway near the area of Hearst-Willits Road and East Valley Road in Willits, described as a "hitchhiker," who had been involved in a physical fight with the driver of a four-wheeler who had picked him up.

## C. Involved Officers

**Sergeant Sam Logan**, a 13-year peace officer with the Mendocino County Sheriff's Office (MCSO), was working the night shift in Willits from 1800 to 0600, a 12-hour shift. Sgt. Logan was in full department issued uniform with badge insignia and MCSO patches and carried the standard issue gear including duty pistol, Taser (Conducted Energy Device — CED), handcuffs, and body worn camera. He was driving a standard MCSO patrol vehicle. Sgt. Logan had previously worked as a Corrections Deputy for approximately 3 years, and served as a Field Training Officer, SWAT Team member, and Detective. He was fully knowledgeable of and trained in all MCSO policies and procedures including Use of Force, Handcuffing and Restraints, Conducted Energy Devices, and Medical Aid and Response.

**Deputy Jesus Lopez**, a 5-year peace officer with the Mendocino County Sheriff's Office (MCSO), was working the night shift in Willits from 1800 to 0600, a 12-hour shift. Deputy Lopez was in full department issued uniform with badge insignia and MCSO patches and carried the standard issue gear including duty pistol, Taser (CED), handcuffs, and body worn camera. He was driving a standard MCSO patrol vehicle. Deputy Lopez had previously worked in Corrections, had passed his Field Training, and had been on solo patrol for 3 weeks. He was fully knowledgeable of and trained in all MCSO policies and procedures including Use of Force, Handcuffing and Restraints, Conducted Energy Devices, and Medical Aid and Response.

**Officer Damian Angell**, a four-year peace officer with Willits Police Department (WPD), was not working a patrol shift but was in full uniform from attending court in Ukiah. He was accompanied by trainee Officer Shively. Officer Angell has been a Field Training Officer since July 2024. He was fully knowledgeable and trained in all WPD policies and procedures including Use of Force, Handcuffing and Restraints, Conducted Energy Devices, and Medical Aid and Response. In addition to his police officer training, Officer Angell was a California Emergency Medicine Technician (EMT) and had 7 years of prior service as a volunteer fire fighter and later paid Captain for the Brooktrails Fire Department.

**Officer John Gale**, a 3-year peace officer with Willits Police Department (WPD), was working the swing shift from 1500 hours to 0300 hours. He was dressed in full department issued uniform and equipment. Prior to working for WPD, Officer Gale had a combined 2.5 years as a peace officer for Del Norte County as a deputy and the City of Weed as a police officer. At WPD he acted as a Field Training Officer and Acting Sergeant. He was fully knowledgeable and trained in all WPD policies and procedures including Use of Force, Handcuffing and Restraints, Conducted Energy Devices, and Medical Aid and Response.

**Officer Donovan Shively**, a Patrol Officer Trainee with Willits Police Department (WPD), whose first day on patrol was May 27, 2025. His FTO was Officer Angell. He was a POST Certified graduate and fully knowledgeable of and trained in all WPD policies and procedures including Use of Force, Handcuffing and Restraints, Conducted Energy Devices, and Medical Aid and Response. In addition, Officer Shively had previously been a volunteer fireman at the Little Lake and Brooktrails Fire Departments.

## D.  Officer Timeline — June 5, 2025



At **1903:29**, MCSO deputies are dispatched at the request of CHP for an agency assist. The information provided from the 911 caller and relayed to deputies is a white male adult was jumping in and out the roadway near the area of Hearst-Willits Road and East Valley Road in Willits. The man, described by Dispatch as a "hitchhiker," was reported to have been picked up by another white male adult on a four-wheeler and subsequently was involved in a physical fight with that male.



**At 1907:34** Deputy Lopez contacts Nicholas Bakewell. Bakewell approaches Deputy Lopez in a fighting stance and was angry. He stated: "What's up then?"

Deputy Lopez believes Bakewell is trying to entice him into a fight. Deputy Lopez attempts to deescalate by giving Bakewell space. Bakewell yells "Back the Fuck Up!"

Bakewell continues to aggressively approach him with clinched fists; the Deputy continues to back up. Deputy Lopez radios back into Dispatch that he was "Out with One". Deputy Lopez unholsters his taser and points it at Bakewell.



At **1907:36** Deputy Lopez asks Bakewell "What's up Bro" and orders him to get down while pointing the taser at him from across the road.



At **1907:38** Bakewell continues to ignore the deputy's commands.

*In the Matter of the Death of Nicholas Bakewell*                    Mendocino County District Attorney



**At 1907:41** Bakewell moves away from Deputy Lopez and is walking along the white fog line of the roadway approximately 25 feet from Deputy Lopez.



**At 1907:47** Deputy Lopez, holding his taser, orders Bakewell to get down on the ground. Bakewell turns to face the deputy and briefly raises his clinched fists and takes a fighting stance. Bakewell turns and begins running away. Deputy Lopez commands Bakewell to stop: "Stop or you are going to be Tased!"



**At 1907:51** Sgt. Logan arrives on scene. That was precisely the same moment Bakewell is running from Deputy Lopez who was commanding him to stop or he would be tased.



**At 1908:00** Sgt. Logan cuts across the road in front of Bakewell. Bakewell appears exhausted, but uncooperative. Deputy Lopez hears Sgt. Logan tell Bakewell: "Hey, you are safe man." Sgt. Logan was standing with his hands free at his sides. Deputy Lopez holstered his taser and unholstered his OC Spray.



**At 1908:06** Bakewell stands, balls his fists, and begins closing the distance between himself and Sgt. Logan. Sgt. Logan then draws his taser and begins to walk backward.



**At 1908:07** Bakewell charges Sgt. Logan.

*In the Matter of the Death of Nicholas Bakewell*                    Mendocino County District Attorney



**At 1908:08** Deputy Lopez runs toward them, OC Spray in hand. All the while, both officers were giving commands which were ignored.



**At 1908:08** The OC Spray deployed by Deputy Lopez makes contact with Bakewell.

Deputy Lopez is approximately 8 feet from Bakewell.



**At 1908:08** Bakewell spins around and runs directly toward Sgt. Logan who is backing away.



**At 1908:09** Sgt. Logan is giving commands for Bakewell to stop. Bakewell continues to spin and then run toward Sgt. Logan's position.



**At 1908:11** Bakewell changes direction and runs off the roadway and jumps directly into a thick area of brush.



**At 1908:12** Deputy Lopez deploys his OC Spray a second time. Bakewell continues to yell incoherently, occasionally saying "No!" but does not appear to acknowledge any instructions from either Deputy Lopez or Sgt. Logan.

He gets on his hands and knees and begins to crawl out of the bushes toward the officers. They tell him to stop and he replies, "Fuck that!"



At **1908:23** Deputy Lopez draws his Taser and orders Bakewell to stop. "You will get tased, dude!"



At **1908:28** Bakewell appears to calm and is quietly saying "No" and "Please stop" as he shakes his head side to side. His arms are in front of him and balled into fists and he is lying on his stomach.

Deputy Lopez tells Sgt. Logan "I'm going to grab him Sarg." and begins to approach Bakewell to handcuff him. Bakewell crosses his arms tightly in front of his chest and continues to say "No." Deputy Lopez again says "I'm going to grab him." Bakewell says "I'm not ok with this."



**At 1908:31 to 1908:40** Deputy Lopez begins attempting to handcuff Bakewell. Bakewell continues to scream. A cuff is placed on Bakewell's left wrist. Bakewell continues to try and lift himself up off the ground and is yelling "Fuck this!" Deputy Lopez attempts to bring Bakewell's right arm back to cuff it as well.



**At 1909:08** Bakewell rolls on his back, his arms out of Deputy Lopez's control and grabbing his duty belt. Sgt. Logan orders Lopez to disengage. Bakewell punches toward Lopez's face.

*In the Matter of the Death of Nicholas Bakewell*                    Mendocino County District Attorney



**At 1909:15** Sgt. Logan deploys his Taser device. Deputy Lopez radios to dispatch that Bakewell has been tased. Bakewell continues to yell and flail while on his back and is non-compliant with orders.

**At 1909:41** Sgt. Logan warns Bakewell he will deploy the Taser again if Bakewell does not roll over onto his stomach. He tells Bakewell "You are under arrest."

Bakewell responds "Fuck you!" Sgt. Logan again tells Bakewell to go onto his stomach and that he is under arrest. Bakewell responds "I am not ok with this." Bakewell continues to shake his head and say "no." Both officers repeatedly tell him he needs to get on his stomach and that he will be tased if he continues to resist.

*In the Matter of the Death of Nicholas Bakewell*                    Mendocino County District Attorney



**At 1909:55** Bakewell attempts to raise his body as if to stand. Sgt. Logan deploys his Taser for a second time. He relays to Deputy Lopez that he sees no weapons on Bakewell. This is occurring as WPD Officer Gale is approaching.



**At 1910:37** Officers Angell, Gale, and Shively from WPD are on scene to assist.

Bakewell continues to lay on his back in the brush. All three WPD Officers and Deputy Lopez and Sgt. Logan pull Bakewell while still on his back from the brush.

Bakewell continues to yell "I am not ok with this!" along with expletives at the officers. Bakewell is rolled onto his stomach and officers attempt to handcuff him. He continues to stiffen his arms requiring two of the assisting WPD officers to move his arm back.



**At 1911:09** Sgt. Logan is located over Bakewell's legs; Bakewell is kicking his legs. Deputy Lopez is straddled over the top of Bakewell's midsection. Officer Gale (blue gloves) took control of Bakewell's head as Bakewell continued to lift it during the struggle.



**At 1911:17** Officer Shively assisted first by briefly placing a knee on the upper back of Bakewell, but then repositioned himself to Bakewell's legs.

Officer Angell is positioned above and off Bakewell's left shoulder. Officer Angell crouches over Bakewell's left shoulder with his knee on his back while he assists Deputy Lopez in gaining control of Bakewell's arms.

During this time, Bakewell is actively attempting to resist the officers' efforts. He attempts to move whenever pressure is lifted from his body, continues to say "No," and curses at the officers.



**At 1911:27** Bakewell is handcuffed. He continuously attempts to lift his body in a resistive manner up to the moment of cuffing and continues resistive behavior after. Officer Gale is instructed to return to his vehicle to obtain the "WRAP" device.

**At 1911:40** Deputy Lopez is able to let go of Bakewell to radio in to Dispatch that he has one detained.

**At 1911:42** Officer Angell pats Bakewell on the back and says "Hey, take some breaths." Officer Gale says "Nick, hey, relax" as he pats him on the shoulder. Bakewell can be heard speaking.



**At 1911:57** Officer Gale returns to where Bakewell is detained. He was unable to locate the WRAP device.

Bakewell can be seen taking deep and complete breaths. Officer Angell did not apply his full body weight and avoided Bakewell's neck area. He concentrated pressure on the shoulder blade and was cognizant not to restrict breathing.



**At 1912:34** Bakewell is moved to a recovery position at the prompting of Sgt. Logan.

**At 1912:40** Sgt. Logan orders the cuffs to be removed from Bakewell. Deputy Lopez radios in to Dispatch for Medical to be ordered Code 3. "Subject Unresponsive." Narcan is requested.

**At 1913:31** Officer Angell begins to direct the application of lifesaving measures such as sternum rubs based on his EMT experience. It is noted that Bakewell's face is beginning to turn purple.

**At 1913:48** Active CPR begins. Narcan is again administered. Bakewell appears to begin responding and he can be heard breathing. He quickly becomes unresponsive again. First Aid continues.

**At 1919** First Responders Arrive.

**At 1942** Nicholas Bakewell is Pronounced Deceased.

## V. LEGAL STANDARDS

The standard of review for officer-civilian use of force is one of objective reasonableness. Penal Code section 835 states:

> An arrest is made by an actual restraint of the person, or by submission to the custody of an officer. The *person arrested may be subjected to such restraint as is reasonable* for his arrest and detention.

The position of the State Legislature with respect to officer use of force is further defined in Penal Code Section 835a, entitled "Legislative findings and declarations; use of force to effect arrest, prevent escape, or overcome resistance; use of deadly force; definitions." In pertinent part, that section states:

> (a)(3) That the decision by a peace officer to use force *shall be evaluated carefully and thoroughly*, in a manner that reflects the gravity of that authority and the serious consequences of the use of force by peace officers, in order to ensure that officers use force consistent with law and agency policies.

> (4) *That the decision by a peace officer to use force **shall be evaluated from the perspective of a reasonable officer in the same situation**, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight, and that the totality of the circumstances shall account for occasions when officers may be forced to make quick judgments about using force.*

> (b) *Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect the arrest, to prevent escape, or to overcome resistance.*

> (d) *A peace officer who makes or attempts to make an arrest need not retreat or desist from their efforts by reason of the resistance or threatened resistance of the person being arrested. **A peace officer shall not be deemed an aggressor** or lose the right to self-defense by the use of objectively reasonable force in compliance with subdivisions (b) and (c) to effect the arrest or to prevent escape or to overcome resistance.* For the purposes of this subdivision, "retreat" does not mean tactical repositioning or other de-escalation tactics.

> (e)(3) "Totality of the circumstances" means *all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force.*

Penal Code section 835a directs that the decision to use force be evaluated from the perspective of a reasonable officer in the same situation, accounting for the fact that officers are sometimes forced to make quick judgments in rapidly evolving circumstances.

Applying that standard here, the officers responded to a subject who had been reported as erratic and violent in a public roadway, who ignored repeated verbal commands, who resisted less-lethal force including OC spray and a conducted energy device, and who continued to actively resist detention up to the moment of handcuffing. At each stage, the level of force employed was a direct response to Mr. Bakewell's active resistance and the threat he posed to officers and the public.

Penal Code section 835a further provides that an officer is not required to retreat or desist from efforts to arrest by reason of the resistance or threatened resistance of the person being arrested and shall not be deemed an aggressor for using objectively reasonable force to effect an arrest or overcome resistance.

The conduct of the officers involved was consistent with this standard. Verbal de-escalation was attempted first. Less-lethal options were deployed before any physical restraint. Physical force was applied only after those measures failed to gain compliance. At no point did the force used exceed what was objectively reasonable given the circumstances confronting the officers in real time.

# VI.  CAUSE OF DEATH, AUTOPSY, AND TOXICOLOGY FINDINGS

## A.  Homicide Defined

As an aid to understanding the findings of the Autopsy Report and Opinions of the Pathologist, Dr. Bennet Omalu, the Guide for Manner of Death Classification by the National Association of Medical Examiners, Fifth Addition was reviewed.

Per that publication, the applicable definition of Homicide is as follows:

> **Homicide** occurs when death results from a volitional act committed by another person to cause fear, harm, or death. Intent to cause death is a common element but is not required for classification as homicide. It is to be emphasized that the *classification of Homicide for the purpose of death certification is a "neutral" term* and *neither indicates nor implies criminal intent*, which remains a determination within the province of legal processes.

The Guide states:

> **The "but-for" principle is commonly applicable.** "But-for the injury (or hostile environment), would the person have died when he/she did?" This logic is often cited as a simple way to determine whether a death should be classified as natural or non-natural (homicide, suicide, accident). The certifier needs to recognize, however, that the intermingling of natural and non-natural factors presents a set of complex considerations in assigning a manner of death. *Regardless of whether the non-natural factor (a) unequivocally precipitated death, (b) exacerbated an underlying natural pathological condition, (c) produced a "natural" condition that constitutes the immediate cause of death, or (d) contributed to the death of a person with natural disease typically survivable in a non-hostile environment,* **this principle remains:** *the manner of death is unnatural when injury hastened the death of one already vulnerable to significant or even life-threatening disease.*

Per the California Supreme Court, a pathologist's reporting classification of "homicide" following an autopsy merely satisfies the clinical definition of the death and does not inherently carry a connotation of criminal wrongfulness. It is not a legal opinion that a law enforcement officer acted unlawfully.[2]

The National Association of Medical Examiners' Guide for Manner of Death Classification recognizes that deaths occurring during law enforcement positional restraint may be classified as Homicide. The Guide addresses death and law enforcement restraint under the section "Principles and recommendations for specific types of cases," which reads:

> **Deaths due to positional restraint induced by law enforcement personnel** or to choke holds **or other measures to subdue** may be classified as Homicide. In such cases, there may not be intent to kill, but the death results from one or more intentional, volitional, potentially harmful acts directed at the decedent (without consent, of course). Further, there is some value to the homicide classification toward reducing the public perception that a "cover up" is being perpetrated by the death investigation agency.

### B. Positional Restraint and Measures to Subdue

California POST guidelines define **positional restraint** as the use of body weight, limb control, or physical positioning to restrict a person's movement for the purpose of effecting lawful arrest or detention. **Prone restraint** involves holding a person face-down while officers gain control of the arms and legs. Placing a person into a **recovery position** involves rolling the person onto their side to assist breathing once control is established. POST guidelines emphasize that once a subject is secured and resistance has ceased, officers are expected to transition the subject out of the prone position and monitor their condition.

California POST guidelines also define **conducted energy devices** (Tasers) as tools designed to achieve temporary incapacitation through neuromuscular disruption for the purpose of gaining subject compliance.

The question of whether a conducted energy device falls within the Guide's language of "other measures to subdue" is relevant here, as Sgt. Logan deployed his Taser twice prior to the physical restraint of Mr. Bakewell. By POST's own definition, a Taser is a measure to subdue, and its deployment constitutes an intentional, volitional act directed at the subject. Consistent with that framework, the Taser deployments in this matter are considered part of the overall continuum of subdual measures applied to Mr. Bakewell and have been evaluated accordingly as part of the District Attorney's comprehensive review.

---

[2]See, *People v. Perry* (2006) 38 Cal.4th 302 [The Supreme Court made clear that a pathologist's reporting classification of "homicide" following an autopsy merely satisfies the clinical definition of the death and does not inherently carry a connotation of criminal wrongfulness. Put another way, a "homicide" designation by a pathologist is a standard vital statistics classification and not a legal opinion that a law enforcement officer acted unlawfully. A pathologist's medical determination of "homicide" is deemed legally neutral regarding criminal liability.]

In this matter, Mr. Bakewell was placed in a prone restraint position after actively resisting arrest, including stiffening his arms, attempting to rise from the ground, and struggling against multiple officers. Five officers were required to bring him under control. Once handcuffed at approximately 7:11 p.m., officers promptly repositioned Mr. Bakewell into a recovery position consistent with POST guidance, removed his handcuffs, and immediately initiated medical aid including sternum rubs, CPR, and the administration of Narcan upon observing that he had become unresponsive.

## C. Cause of Death

The manner of death in the case was determined to be Homicide by pathologist Dr. Bennet Omalu.

Nicholas Bakewell died as a result of Restraint-Associated Asphyxiation and Type 2 Myocardial Ischemic Injury. Contributing factors were Acute Combined Methamphetamine, Psilocin, Dextromethorphan and Gamma-Hydroxybutyric Acid Toxicity, Hypertensive Cardiomyopathy and W.H.O. Class III Obesity.

## D. Autopsy Findings

The autopsy showed the decedent had cardiomegaly (a severely enlarged heart), biventricular hypertrophy (heart chambers were abnormally stiff and thick) as well as atrioventricular dilation (abnormal enlargement of the upper and lower heart chambers). Also noted was acute and severe pulmonary edema and congestion of the lungs, as well as severe hepatomegaly of the liver.

## E. Toxicology

All tested body fluids show that multiple drugs were present, with methamphetamine being the most prominent and widely distributed substance. The decedent was metabolizing and eliminating several of these drugs.

Femoral blood showed: d-Methamphetamine levels at 3.2 mg/L; d-Amphetamine levels at 0.23 mg/L; Psilocin levels at 23 ng/mL; Dextromethorphan levels at 0.09 mg/L; GHB levels at 17.9 mg/L.

Vitreous humor showed: d-Methamphetamine levels at 4.1 mg/L; d-Amphetamine levels at 0.27 mg/L; Psilocin levels at 7.1 ng/mL; Dextromethorphan levels at 4.2 mg/L; GHB levels at 17.9 mg/L.

Urine showed: Amphetamine levels at >40 mg/L; d-Methamphetamine levels at 218 mg/L; d-Amphetamine levels at 14 mg/L; MDMA levels at 0.42 mg/L; Fentanyl was Positive; Norfentanyl levels were 20 ng/L; Psilocin was Positive; Dextromethorphan levels at >0.50 mg/L.

Bile showed: Amphetamine levels at 27 mg/L; d-Methamphetamine levels at >5 mg/L; d-Amphetamine levels at 0.58 mg/L; MDMA levels at 0.05 mg/L; GHB levels at 4.3 mg/L.

The most prominent substance was methamphetamine, present in a much higher amount than its breakdown product, amphetamine.   This is a pattern consistent with relatively recent methamphetamine use. The amount of methamphetamine detected shows substantial systemic exposure with active metabolism and elimination.

At these concentrations, methamphetamine may produce very strong stimulant effects on both the body and the mind, including a very rapid heartbeat, elevated blood pressure, overheating, sweating, tremors, chest discomfort, extreme agitation, anxiety, paranoia, confusion, and impulsive or erratic behavior.

There was also psilocin, the active chemical produced in the body after someone consumes psychedelic mushrooms, which may primarily affect perception and thinking rather than the heart or other major body systems, causing visual distortions, altered sense of time, intensified emotions, unusual thoughts, and changes in mood.

The remaining substances detected dextromethorphan, GHB, MDMA (in urine), and fentanyl (in urine) represent additional psychoactive drugs that can affect the brain and body in different ways, and together could contribute additional stimulant, sedative, or perceptual effects. Their likely impact would depend on individual tolerance, timing of use, and interaction with the other drugs present.

## III. CONCLUSION AND DETERMINATION

After evaluating the totality of the evidence, the District Attorney's Office concludes that the officers' use of force was objectively reasonable under the circumstances known to them at the time.

The evidence shows that officers responded to a subject who had been reported as erratic and violent in a public roadway and who had already punched and injured multiple civilians prior to law enforcement contact. Officers attempted verbal de-escalation and issued repeated commands for compliance. Less-lethal force, OC spray and two Taser deployments, was used only after Mr. Bakewell ignored commands and advanced toward officers in a fighting stance. Physical restraint was applied only after those measures failed to gain compliance.

At each stage, the level of force was a direct and proportionate response to Mr. Bakewell's active resistance and the threat he posed to officers and the public. The encounter unfolded rapidly and required officers to make split-second decisions in a dynamic and evolving situation. Upon observing Mr. Bakewell in medical distress, officers immediately rendered aid.

The medical evidence establishes that Mr. Bakewell's death resulted from restraint-associated asphyxiation and myocardial ischemic injury in the context of significant underlying cardiac disease and acute multi-substance intoxication. The manner of death was classified by the pathologist as "Homicide[3]," consistent with the National Association of Medical Examiners' Guide for Manner of Death Classification, which provides that deaths resulting from positional restraint or other measures to subdue, including Taser deployments, may be classified as Homicide where death results from intentional, volitional acts directed at the decedent, regardless of intent to kill. That classification is acknowledged. It is a term of art used in death certification and does not determine criminal culpability, which requires a separate legal analysis of whether the force used was objectively reasonable under the circumstances known to the officers at the time.[4]

Under California law, criminal liability requires proof that an officer's use of force was not objectively reasonable when viewed from the perspective of a reasonable officer in the same situation, without the benefit of hindsight.[5] The available evidence does not support such a finding. Accordingly, no criminal charges will be filed in connection with this incident.

This determination is limited to criminal liability under California law. Questions of civil liability, administrative review, or departmental policy compliance are addressed through separate legal and administrative processes.

The District Attorney's Office acknowledges the loss suffered by the family and loved ones of Nicholas Bakewell and remains committed to transparency, accountability, and the fair and impartial administration of justice.

Eloise Kelsey
Senior Deputy District Attorney, County of Mendocino

C. David Eyster
District Attorney, County of Mendocino

---

[3] See Footnote 2.

[4] See Penal Code section 835a(a)(4),(d)

[5] See, *Golick v. State of California* (2022) 82 Cal.App.5th 1127. [A peace officer may use reasonable force to make an arrest, prevent escape, or overcome resistance, and need not desist in the face of resistance.]; *Tatum v. City and County of San Francisco* (2006) 441 F.3d 1090. [Officer had probable cause to arrest, arrestee was behaving erratically, and arrestee spun away from officer and continued to struggle after officer told him to calm down.]; *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516. [As long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the most reasonable action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence.]